[L. A. No. 4935. Department One.—September 3, 1919.]

FRED W. SIEGEL, Respondent, v. G. A. HECHLER et al.,
Appellants.

[1] PRINCIPAL AND SURETY—BOND OF SUBCONTRACTOR—DEFAULT—PRE-
MATURE PAYMENTS BY CONTRACTOR—EFFECT OF.—The surety on the
bond of a subcontractor is not released from the entire obligation
by reason of premature payments made by the contractor on the
subcontractor's default, but the effect is to leave the contractor
without a .cause of action on the bond to recover the amount of the
premature payments.

[2] ID.—DEFAULT OF SUBCONTRACTOR—IMMEDIATE PAYMENT OF BILLS BY
CONTRACTOR—SURETY NOT RELEASED.—Where a subcontract provided
that the subcontractor should save the contractor free and harmless
from any and all liability which might accrue against or upon the
latter as the result of any default of the former in the performance
of his subcontract, and by the bond executed by the surety company
it became bound to the effect that the subcontractor should perform
all the covenants and agreements on his part in the subcontract,
upon breach by the subcontractor, the immediate payment by the
contractor of bills for work done and materials furnished to the
subcontractor, which were lienable under section 1184 of the Code
of Civil Procedure, was not premature and did not release the surety
company from its obligation.

APPEAL from a judgment of the Superior Court of Los
Angeles County. Curtis D. Wilbur, Judge. Affirmed.

The facts are stated in the opinion of the court.

Hickcox & Crenshaw for Appellants.

Overton, Lyman & Plumb for Respondent.

SHAW, J.—The Southwestern Surety Insurance Company
appeals from a judgment against it in favor of plaintiff upon
a bond executed by it as surety for G. A. Hechler for the per-
formance of a subcontract between Hechler and the plaintiff
for the doing of a part of the work upon a building under
erection by Siegel.

The Marlborough school for girls, a corporation engaged in
the business of conducting a girls' school, made a contract
with Siegel for the erection of a school building on its premises

at the contract price of seventy thousand dollars. The contract, with elaborate plans and specifications, was duly filed in the recorder's office on July 12, 1915. Siegel and Hechler entered into a subcontract whereby Hechler agreed to do the excavation and concrete work on the building as required by said plans and specifications, for the sum of seven thousand dollars. Hechler began work on the subcontract about September 7, 1915, and continued at the work until November 7, 1915, at which time he absconded, leaving the work unfinished. Siegel completed the subcontract work at his own expense. Hechler was made a defendant, but he was not served with process. The case proceeded to judgment against the surety company alone.

The complaint alleges that while Hechler was engaged in the work Siegel paid him, in accordance with the terms of the contract, $4,537.87; that after Hechler abandoned the work Siegel paid for labor performed upon, and materials and supplies used in, the subcontract work by Hechler and left unpaid by him, sums amounting to $3,925.33, and that in completing the building after the abandonment by Hechler plaintiff expended $2,139.43, which was the reasonable cost of such completion. He asked judgment for the difference between the aggregate of these sums and seven thousand dollars, the subcontract price.

The denials and affirmative allegations of the answer set up the defense that the sums amounting to $4,537.85 alleged to have been paid to Hechler while the work was going on, were not paid "in accordance with the terms of said contract," and that Siegel violated his agreement with Hechler, for the performance of which the bond was given, by paying money to Hechler in excess of the amount due on the subcontract at the time of such payment, whereby, it is claimed, the surety was released.

The court found that while Hechler was engaged in the work Siegel paid him, "in accordance with the terms of said subcontract," $4,526.90; that after the abandonment Siegel paid $3,925.33 on bills due from Hechler for materials and labor used in the subcontract work, and that Siegel completed the work on the subcontract at the reasonable expense of $2,139.43. This made an excess of $3,591.66 paid out by Siegel over the subcontract price, for which excess judgment was given in favor of the plaintiff.

The terms of the subcontract regarding payments by Siegel to Hechler and which it is claimed Siegel violated by premature payments were as follows:

"Second: That the said General Contractor will in consideration of the said covenants and agreements being strictly performed and kept by the said Sub-contractor, as hereinabove mentioned, well and truly pay, or cause to be paid, unto the said Sub-contractor the said sum of money above mentioned as the Sub-contract price.

"In the manner following: Such amounts as Hechler may need for pay roll on or before twelve o'clock noon of each and every Saturday following beginning of work and balance thirty-five days after completion of this contract, but in the event that the General Contractor should deem himself insecure by reason of a possibility that the laborers or the materialmen of the Sub-contractor may file claims of liens upon said property, or may give to the Owner notices to withhold money from the General Contractor, then the General Contractor may at his option withhold further payments until furnished with receipts or releases from all such materialmen and laborers."

It is the contention of the plaintiff that the phrase "such amounts as Hechler may need for pay-roll on or before twelve o'clock noon of each and every Saturday following beginning of work" covers only payments of the weekly wages of the men employed by Hechler, or other regular weekly sums contracted to be paid by him for the doing of work on the subcontract. It appears from the evidence that in the course of the work Hechler incurred bills in the performance thereof upon which Siegel paid the sums following, to wit: On September 23, 1915, to Butterfield & Scaer $350, for steam shovel work; October 1, 1915, to E. E. Scott, for hauling and excavating, $450; and on October 21, 1915, to L. A. Rock and Gravel Company $759, for materials used in the work, a total of $1,559. The point made by the appellant is that these sums could not have been included in any pay-roll, within the meaning of the subcontract, and that under its terms they did not become due to Hechler, or payable on his account, until thirty-five days after the completion of his subcontract. The argument is that by this departure from the terms of the contract the surety was prejudiced and thereby it was released from its obligation. If the word "pay-roll" has the

meaning this argument assumes, the above-mentioned pay-ments were premature, so far as the terms of the subcontract just quoted are concerned.

[1] It is not an accurate statement of the law to say that the surety would be released from the entire obligation by rea-son of premature payments. They would not be an alteration of the contract for the performance of which the defendant had become surety. They would be a departure therefrom or a vio-lation thereof, effected by the parties during its performance, without the consent of the surety. The legal result of such departure would not be to release the surety from the entire obligation. The effect would be that Siegel would have no cause of action on the bond to recover from the surety that part of Hechler's defalcation that was made up of these premature payments. The authorities cited by appellant con-cerning the effect of a material alteration in the contract after the surety has become bound thereon and without its consent are not strictly applicable.

There are persuasive reasons, growing out of the nature of the subcontract and the work to be done thereunder, in con-nection with the law as to the liens of mechanics, for giving the above-quoted word "pay-rolls" a broader meaning. But we take a view of the case which renders it unnecessary to determine whether the narrower or broader interpretation is correct and we therefore leave the question undetermined. There are other terms of the subcontract and there were other circumstances, both of law and fact, which must be taken into consideration and which show that Siegel had the right to pay these bills at the time they were paid.

The subcontract provides that Hechler shall save Siegel "free and harmless" from any and all liability which might accrue against or upon Siegel as the result of any default of Hechler in the performance of the subcontract. By the bond executed by the surety company it became bound to the effect that Hechler should perform all the covenants and agreements on his part in said subcontract, including, of course, the one just mentioned, and should indemnify and save harmless the said Siegel against all loss which he might sustain by reason of any claim or claims of lien filed with the county recorder or any notice given to the owner to with-hold money from Siegel for any labor performed or material furnished in the work, "or by reason of any demands or

claims which shall be made against said owner or Fred W. Siegel for such labor or materials." Under the law as it stood at the time these contracts were made and the work done, every person furnishing materials or doing work upon the building, whether for a subcontractor or for the general contractor, was entitled to file a lien upon the owner's property and upon the building therefor, at any time within thirty days after he had ceased to labor or had ceased to furnish materials (Code Civ. Proc., sec. 1187), and such person could also at any time give a stop notice to the owner and thereby authorize the owner to withhold payments from the general contractor upon the principal contract. (Code Civ. Proc., sec. 1184.) It appears from the evidence that the bills, aforesaid, were presented to Siegel and that the money was then due from Hechler to the respective claimants for work done or material furnished and used in the building. The answer does not allege, and it is not claimed, that the demands thus made upon Siegel were not then lienable under the law. A stop notice could have been given therefor immediately. Siegel, therefore, immediately incurred a liability, through this default, to have liens filed on the premises for these bills and stop notices given therefor to the owner to withhold money due to Siegel on the main contract. He was liable to be greatly embarrassed by these consequences of such failure on the part of Hechler. Such failure was a violation of Hechler's covenant to save the general contractor "*free* and harmless" from any and all liability which might accrue against or upon Siegel as the result of any default of Hechler. It was also a violation of the terms of the bond whereby the surety undertook that Hechler should perform all the covenants of the subcontract and save Siegel harmless against loss by reason of any demands or claims which might be made against him or the owner for labor or materials upon the subcontract work and against loss which he might be put to by reason of liens filed or stop notices given to the owner. Hechler having failed, the only way by which Siegel could save himself harmless from such failure and free himself from the liability thus imposed was by paying the bills at once. It was his right, if not his duty, to prevent as much of the damage that might flow from Hechler's nonpayment as he could with reasonable effort, under the circumstances. If he had not been able to pay these bills at the time and addi-

tional damage to himself had followed therefrom, the surety would have had so much the more to pay on the bond. The mere fact, therefore, that the bills were paid prior to the time specifically fixed by the payment clause of the subcontract for the payment of anything other than the sums necessary for pay-rolls, even if it were true, does not determine the question of the surety's release. Siegel had the right to rely upon the other covenants of the contract and bond whereby the surety became bound for Hechler's failure to save Siegel free from the liability that stop notices and liens should be filed. [2] His payment of these bills for that purpose was therefore not a violation of the contract, but was in accordance with his rights thereunder. The fault was that of Hechler in leaving his bills unpaid, thus to become a demand against Siegel or a potential lien upon the building being erected by Siegel, and the surety's obligation was that Hechler would not commit such default.

For these reasons we are of the opinion that the finding of the court, of which appellant complains, to the effect that all sums of money paid by plaintiff to defendant Hechler were paid in accordance with said subcontract and for pay-rolls, was immaterial and not prejudicial to the appellant, even if it were based on an erroneous construction of the contract. The evidence shows that these payments were not made to Hechler personally, but were paid to the respective claimants by Siegel at Hechler's request. As Siegel had a right to pay them, it is immaterial whether they were technically to be included in the pay-rolls or not.

There is a general finding that while Hechler was engaged in the work Siegel paid to him, in accordance with the terms of the subcontract, the sum of $4,526.90. This sum includes the above-mentioned payments claimed to be premature. We have shown that these payments were paid in accordance with the terms of the subcontract. This finding is supported by the evidence and it is sufficient to support the judgment.

The judgment is affirmed.

Lawlor, J., and Olney, J., concurred.