Filed 10/26/20  Los Angeles Unified etc. v. Torres Construction CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| LOS ANGELES UNIFIED SCHOOL DISTRICT,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TORRES CONSTRUCTION CORP. et al.,<br><br>Defendants and Appellants. | B291940<br><br>(Los Angeles County Super. Ct. No.  BC485280) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert L. Hess, Judge.  Affirmed.

SMTD Law, Jonathan J. Dunn, Andrew C. Harris; AlvaradoSmith, Raul F. Salinas and William M. Hensley for Defendants and Appellants.

Orbach Huff Suarez & Henderson, David M. Huff, Colin E. Barr, Kelly Houle-Sandoval; Mark A. Miller for Plaintiff and Respondent.

# SUMMARY

Appellant Torres Construction (Torres) agreed to renovate school cafeterias for the Los Angeles Unified School District (LAUSD). Appellant Western Surety Company (Western) bonded Torres's performance on the project. The project encompassed three phases. LAUSD ended up filing a civil complaint against appellants for breach of contract arising out of all three phases of the cafeteria renovations.

This appeal is from a judgment entered after an encyclopedia of partial adjudications of the causes of action in LAUSD's complaint against appellants. The parties brought motions for summary judgment, motions for judgment on the pleadings, motions for summary adjudication, and motions for directed verdicts; a few remaining claims survived these motions and were decided by jury verdict. Ultimately, LAUSD prevailed on its claims for breach of contract and was awarded $3,941,829 in damages. Western was found liable on its bonds. The parties settled Torres's offset claims for withheld payments on other jobs in the amount of $556,296.89 plus $151,958.47 in interest. LAUSD was awarded prejudgment interest of $1,232,887.88 and costs in the amount of $88,716.97. LAUSD's net recovery was $4,555,178.49. In addition, LAUSD was awarded $2.1 million in attorney fees against Western alone.

This appeal is from the final judgment, but appellants do not directly challenge every court ruling. Torres focuses on 1) the denial of appellants' motion for summary judgment; 2) the grant of LAUSD's motion for summary adjudication on about half of the job orders it issued to Torres; and 3) the award of prejudgment interest. Torres contends its summary judgment motion should have been granted because LAUSD elected to sue on the overall

2

job order contracts, which were merely agreements to negotiate, rather than on the individual job orders for the school renovations, which were the final agreements. Torres also contends the trial court erred in granting LAUSD's motion because 1) the trial court abused its discretion when it admitted evidence offered by LAUSD in reply to Torres's opposition to summary judgment; 2) Torres's offset affirmative defense rendered LAUSD's damages uncertain; 3) LAUSD failed to obtain independent cost estimates, which were a statutory condition precedent to Torres's performance; and 4) there were triable issues of material fact about waiver. Torres contends the trial court abused its discretion in awarding prejudgment interest because LAUSD's damages were uncertain.

Western joins Torres's claims, and adds additional claims based on three of its affirmative defenses related to suretyship: 1) the statute of limitations on the bonds had run; 2) notice to the surety was deficient; and 3) LAUSD's damages were not recoverable under the bond. Western contends LAUSD's motion for summary adjudication should have been denied because LAUSD failed to negate these three affirmative defenses related to suretyship. Western also challenges the denial of its motions for directed verdict on these three affirmative defenses. Additionally, Western contends the trial court abused its discretion in awarding attorney fees in the absence of more detailed information about the work of each attorney.

Some of appellants' claims have been forfeited on this appeal due to appellants' 1) failure to provide adequate, or, in some cases, any record citations; 2) failure to fully develop their arguments; and 3) failure to cite supporting relevant California

3

legal authority.[1]  As for the remaining claims, we find no error. The judgment is affirmed.

## BACKGROUND

Beginning in 2003, California statutorily authorized LAUSD to use an alternative procedure for bidding of public works projects.  (Assem. Bill No. 14 (2003-2004 Reg. Sess.) § 1 (AB14).)  This procedure, known as job order contracting, was defined in former Public Contracts Code sections 20919 through 20919.15.[2]  The Legislature stated that "[t]he benefits of a job order contract project delivery system include accelerated completion of the projects, cost savings, and reduction of construction contracting complexity."  (§ 20919, subd. (c).)  The Legislature stated the procedure should be used to reduce project costs and expedite project completion.  (*Id.*, subd. (d).)

Under this system, a job order contract (JOC) is competitively bid and awarded to the lowest responsible qualified bidder.  (§ 20919, subd. (g).)  A JOC is defined as a contract "in which the contractor agrees to a fixed period, fixed unit price, and

---

[1]    See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 (*United Grand Corp.*).

[2]    All further statutory references are to that version of the Public Contract Code unless otherwise indicated.

The code was revised in 2012, after the events in this case had occurred.  All citations to section 20919 et seq. are to the pre-2012 version of the code, as shown in AB 14.

4

indefinite quantity contract that provides for the use of job orders for public works or maintenance projects." (§ 20919.1, subd. (e).)[3]

For each JOC up for bid, LAUSD was required to provide potential bidders with a set of documents which include a construction task catalog and the JOC technical specifications, which in turn include General Conditions. (§§ 20919.4, subd. (a)(1); 20919.1, subds. (b) & (f).) The General Conditions set forth all the terms and conditions of the JOC, including pricing formulas, audit rights, insurance requirements, and payment obligations. The 2005 and 2007 General Conditions for the JOCs at issue in this appeal average about 90 pages. The bidders use the JOC documents to bid an adjustment factor that the bidder will charge for unit prices listed in the construction task catalog. LAUSD awards the JOC to the lowest responsible prequalified bidder. (§20919.4, subd. (b)(1).) The construction task catalog and General Conditions are incorporated into the JOC as contract documents.

Once a JOC is awarded, LAUSD may order the contractor to perform work by issuing individual job orders under the JOC, using the procedures outlined in the General Conditions. LAUSD first notifies the contractor that work is necessary. The contractor is required by the JOC to participate in a "joint scope meeting" at the project site, as a result of which they develop a Detailed Scope of Work. LAUSD then issues a Request for Proposal (RFP) to the contractor, who is contractually required to prepare a Job Order Proposal (proposal) which sets forth the cost of performing the work.

---

[3]    " 'Indefinite quantity' means one or more of the construction tasks listed in the catalog of construction tasks." (§ 20919.1, subd. (c).)

5

By statute a proposal is defined as "the job order contractor prepared document quoting those construction tasks listed in the catalog of construction tasks that the job order contractor requires to complete the project scope of work, together with the appropriate quantities of each task. The pricing of each task shall be accomplished by multiplying the construction task unit price by the proposed quantity and the contractor's competitively bid adjustment factor." (§ 20919.1, subd.(*l*).) Under the JOCs at issue here, the proposal must be prepared using either the statutory method or, if the task cannot be found in the construction task catalog, using a non-prepriced (NPP) work formula set forth in the General Conditions. (See § 20919.1, subd. (*l*).) If the proposal is approved, it becomes part of the job order. A job order is defined as "a firm, fixed price, lump-sum order issued by [LAUSD] to a job order contractor for a definite project scope of work as compiled from the catalog of construction tasks to be performed pursuant to a job order contract." (*Id*., subd. (d).) Job orders are incorporated into the master JOC as contract documents.

As relevant here, Torres was the successful bidder on five JOCs for general contracting services, which LAUSD referred to in its complaint as JOC Contract No. 1 and two JOCs for electrical services, which LASUD referred to as JOC Contract No. 2. The earliest contract date is December 21, 2005 and the latest is February 5, 2008.

In March 2008, LAUSD began a program to modernize middle and high schools as part of LAUSD's district-wide Café LA program. The work was scheduled to occur in three phases. Phase I involved the purchase of a uniform set of kitchen equipment for schools. Phase II involved the purchase of

6

additional kitchen equipment which varied by school. Phase III involved the installation of the Phase I and II equipment and electrical upgrades. Torres submitted proposals for this work, and ultimately was awarded 19 Phase I Job Orders, 18 Phase II Job Orders and 18 Phase III Job Orders.

Torres installed kitchen equipment and made electrical upgrades in the schools covered by its Job Orders. LAUSD made the required payments on those Job Orders.

At some point prior to October 2011, LAUSD began a contractually authorized audit of Torres's job orders for the Café LA project. The General Conditions provide that LAUSD has the right to review, obtain, inspect, audit and copy all contractor records pertaining to the contract work. Under the 2005 General Conditions, the contractor agreed to maintain such records and to submit to an audit for a period of up to four years following the date the Notice of Completion is recorded; under the 2007 General Conditions, the contractor agreed to the audit without reservation. If the audit "discloses overpricing or overcharges of any nature by the CONTRACTOR to [LAUSD] in excess of one percent (1%) of the total Contract Amount, then, in addition to all other LAUSD rights and remedies, and in addition to making adjustments for the overcharges and/or overpricing," [LAUSD] would be reimbursed for the costs of the audit.

In the final audit dated October 24, 2011, the LAUSD auditor found what it believed were substantial irregularities in Torres's pricing of the Phase I and II Job Orders and in Torres's billing for the Phase III Job Orders. For the Phase I Job Orders, the audit found LAUSD had directed Torres to purchase equipment in the catalog of its subcontractor Trimark, and Torres had supplied LAUSD with that required equipment but

7

"the pricing and description of the equipment in the Contractor's detailed cost proposal did not reflect the equipment it supplied or the equipment required in the scope of work." The audit found "Torres supplied the District with equipment it purchased from Trimark but its cost proposal consisted of unrelated equipment and prices from the Construction Task Catalog (CTC)." The equipment Trimark actually suppled should have been priced using the NPP work formula in the contract, but Torres did not use this methodology.

For the Phase II Job Orders, Torres did use the correct method of pricing (NPP work) but did not apply the correct mark-up amount, resulting in a total overpricing of about 11 percent.

For the Phase III Job Orders, "Torres did not provide all the services listed in the scope of work, but billed the District for the entire service required in the scope of work." "For example, Torres billed for larger size transformers than supplied, thicker wires than installed, larger quantities of electrical, piping and ductwork materials than supplied and some HVAC work was not performed."

On May 23, 2012, LAUSD filed this action against Torres and Western, alleging breach of the JOC's and breach of the bonds. After the trial court granted summary adjudication in LAUSD's favor on all 19 Phase I Job Orders and 9 Phase II Job Orders, the case proceeded to jury trial. At the close of evidence, the trial court granted LAUSD's motions for directed verdict on all the remaining Phase II Job Orders and 15 of the 18 remaining Phase III Job Orders. Following a jury verdict on the remaining three Job Orders, the court awarded prejudgment interest and attorney fees. This appeal followed.

## DISCUSSION

We review an order granting or denying summary judgment or summary adjudication independently. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 (*Wiener*); *Buss v. Superior Court* (1997) 16 Cal.4th 35, 60 (*Buss*).) " ' "First, we identify the issues raised by the pleadings, since it is these allegations to which the motion must respond; secondly, we determine whether the moving party's showing has established facts which negate the opponent's claims and justify a judgment in movant's favor; when a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." ' " (*Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 229 (*Claudio*).) " 'Declarations of the moving party are strictly construed, those of the opposing party are liberally construed, and doubts as to whether a summary judgment should be granted must be resolved in favor of the opposing party. The court focuses on issue finding; it does not resolve issues of fact.' " (*Assilzadeh v. California Federal Bank* (2000) 82 Cal.App.4th 399, 409 (*Assilzadeh*).)

" '[D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed.' " *(Claudio, supra,* 134 Cal.App.4th at p. 230.)

9

In motions for summary judgment or adjudication, " '*all* material facts must be set forth in the separate statement. "This is the Golden Rule of Summary Adjudication: if it is not set forth in the separate statement, *it does not exist.*" ' [Citation.] Thus, when the 'fact' is not mentioned in the separate statement, it is irrelevant that such fact might be buried in the mound of paperwork filed with the court, because the statutory purposes are not furthered by unhighlighted facts." (*North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 30-31.) "The corollary for an opposing party, unless it wishes to advance additional disputed or undisputed material facts, is that it clearly indicate which of the facts contained in the moving party's separate statement it disputes. ([Code Civ. Proc.,] § 437c, subd. (b)(3).) Each party also must supply a 'reference to the supporting evidence' in its separate statement ([Code Civ. Proc.,] § 437c, subd. (b)(1), (3))." (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1214.)

" 'If, in deciding this appeal, we find there is no issue of material fact, we affirm the summary judgment if it is correct on any legal theory applicable to this case, whether or not that theory was adopted by the trial court, and whether it was raised by the [defendant] in the trial court or first addressed on appeal.' " (*Assilzadeh, supra,* 82 Cal.App.4th at p. 409.)

I. ***Appellants' Motion For Summary Judgment Was Properly Denied Because A JOC Is An Enforceable Contract, Not Just An Agreement To Negotiate.***

Appellants' Motion for Summary Judgment was the first potentially dispositive motion to be heard by the trial court. Appellants sought judgment in their favor on the ground that JOCs are contracts to negotiate further contracts and could not

10

support LAUSD's claims for damages. Appellants argued because LAUSD did not allege Torres failed to negotiate, which was the only cognizable breach of the JOCs, it was not entitled to expectation damages. Appellants took the position that each Job Order was a separate contract from the JOC, and LAUSD should have sued for breach of the Job Orders rather than the JOCs.[4] Thus, appellants' arguments were essentially legal arguments based on the pleadings and the face of the contracts. The trial court and the parties agreed that these two grounds for summary judgment were the functional equivalent of motions for judgment on the pleadings. The trial court denied the motion.

To prevail on its motion, a defendant moving for summary judgment must conclusively negate a necessary element of the plaintiff's case or establish a complete defense thereto. (*Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 468.) When a motion for summary judgment challenges the sufficiency of the pleadings rather than the evidence supporting the allegations therein, it is tantamount to a motion for judgment on the pleadings and may be treated as such by the trial court. "The practical effect of this procedure is that in granting judgment on the pleadings, the trial court may give the plaintiff the opportunity to amend the complaint even when no motion to amend has been filed." (*Taylor v. Lockheed Martin Corp.* (2000) 78 Cal.App.4th 472, 479.) "The standard for granting a motion

---

[4]  In an attempt to persuade us, Torres resorts to poetry here, referring to Robert Frost's poem "The Road Not Taken" to characterize LAUSD's "conflicted" choice. We find that all roads led back to the General Conditions. Thus, if poetry is called for, "the end of our exploring/ Will be to arrive where we started/And know the place for the first time." (Eliot (1942) "Four Quartets.")

11

for judgment on the pleadings is essentially the same as that applicable to a general demurrer, that is, under the state of the pleadings, together with matters that may be judicially noticed, it appears that a party is entitled to judgment as a matter of law." (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216 (*Schabarum*).)

The standard of review for a motion for summary judgment and a motion for judgment on the pleadings is essentially the same:  we independently review the trial court's order.  (*Wiener, supra*, 32 Cal.4th at p. 1142; *Buss, supra*,16 Cal.4th at p. 60; *Schabarum, supra*, 60 Cal.App.4th at p. 1216.)  We agree with the trial court that appellants' motion was much closer to a motion for judgment on the pleadings than for summary judgment, but however the motion is characterized, we find the motion was properly denied.

Appellants first contend that the legislative history of the bill enacting job order contracting shows that JOC's are merely agreements to negotiate.[5]  Appellants quote two documents from that history which state that after the bidding process, the contractor and the owner/LAUSD enter into "a contract defining the overall relationship."  Appellants understand this to mean that the JOC only establishes a relationship which lacks any specifics and simply establishes that the parties will agree to specifics in the future.

There is nothing to indicate what the writer meant by the phrase "overall relationship."  The term can mean either "involving only main features" or "including everything."

---

[5]    Having received no opposition from LAUSD, we grant appellants' request that we take judicial notice of the legislative history.  (Evid. Code, §§ 452, 453.)

12

(<https://www.vocabulary.com/dictionary/overall> [as of Oct. 26, 2020].)  It is far more accurate and useful to look at the JOCs, which incorporate the General Conditions.  Those terms are very detailed, and describe far more than the main features of the relationship.  To give just one example (apart from the pricing related provisions), the General Conditions contain an elaborate and detailed discussion of the notice required upon the occurrence of specific events, as we discuss in some detail, *post*, in our analysis of Western's motion for directed verdict on this topic.  Looking at the 90 pages of General Conditions, it is simply not reasonable to view the JOCs as only defining the broad or main features of the relationship.

Appellants next turn to *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251, a case which they cited in the trial court, but which is not dispositive.  The contract at issue in *Copeland* involved a potential agreement by defendant to purchase ice cream and, when the defendant broke off negotiations, the parties had not reached agreement on key terms of the ice cream purchase agreement, such as flavor, quantity, quality, pricing, trademark protection, and liability for spoilage. (*Id*. at p. 1254.)  Both parties agreed on appeal that no ice cream purchase contract had been formed.  The issue in *Copeland* was not whether a binding agreement to purchase had been formed but whether and what kind of damages were available for breach of an agreement to negotiate.  Plaintiff sought lost profits. As the court explained, "damages for breach of a contract to negotiate an agreement are measured by the injury the plaintiff suffered in relying on the defendant to negotiate in good faith. This measure encompasses the plaintiff's out-of-pocket costs in conducting the negotiations and may or may not include lost

13

opportunity costs. *The plaintiff cannot recover for lost expectations (profits) because there is no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an ultimate agreement.*" (*Id.* at pp. 1262–1263, fns. omitted, italics added.)

*Copeland* does not offer any support for appellants' argument that the JOCs are, in fact, just contracts to negotiate. At most, *Copeland* discusses that determining whether the specific contract at issue is an agreement or merely an agreement to negotiate depends on the terms of the agreement and the relationship of the terms to the work to be performed or services rendered under the ultimate contract.[6]

To determine whether the JOCs in this case are agreements or merely agreements to negotiate, we look at the terms of the contracts, and at the various documents incorporated in those contracts. "Where a contract is clear and unambiguous, it is interpreted by the language therein without resort to extrinsic evidence. [Citations.] Such interpretation is a question of law [citations], which may be resolved on summary judgment." (*Niederer v. Ferreira* (1987) 189 Cal.App.3d 1485, 1499.)

Here, LAUSD is not suing on an agreement that never materialized. The JOCs are valid executed agreements, and the

---

[6] Similarly, in *Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th 1150, the court looked to the contents of the term sheet at issue to determine whether the parties had an agreement, or merely an agreement to negotiate. (*Id.* at pp. 1169–1171.) The court concluded that "although the term sheet is extremely detailed, it *expressly* binds the parties to only continue negotiating in good faith." (*Id.* at p. 1171, italics added.)

14

parties agreed to far more than simply to negotiate future job orders. Under the General Conditions of the JOCs, the parties agreed to every key term of future job orders except one: the Scope of Work for any projects which LAUSD would assign to Torres.

LAUSD is not suing on a Scope of Work that never materialized. There is no claim that the required Scope of Work for each job order was not established as required by the General Conditions of the JOCs. Under the General Conditions, once the Scope of Work is properly established, LAUSD issues its RFP, and the contractor is required to respond with a proposal which prices the work using the applicable formulas in the General Conditions. This is arithmetic, not negotiations.

Appellants argue that even after the Scope of Work is established, and a proposal is required, there is still only an agreement to negotiate because the General Conditions provide for termination of the contractor if it fails to provide the required proposal. In fact, the General Conditions provide LAUSD can terminate the Contract for cause if the contractor fails to timely submit a proposal. We fail to see how this agreed-upon remedy supports appellants' argument that the JOCs are not binding agreements to perform work. How is this different from a provision which would permit an owner to terminate a contract if the contractor falls behind the construction schedule or simply fails to show up at the work site? "We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' " (*United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 153.)

15

Appellants further argue there was no binding agreement even after the Scope of Work was determined and a proposal submitted, because "there could be no expectation Torres would build or bill for anything until the [job order] issued." They are mistaken. Once a contractor submits a proposal, he is "expected" to do the work. As Torres itself noted, under the 2005 General Conditions, once the contractor submits a proposal, LAUSD can issue a notice to proceed in lieu of a job order. The contractor will be paid according to the pricing formulas for work actually performed. This requirement is less direct under the 2007 General Conditions, but when a contractor submits its proposal, it is "agreeing to accomplish the Work as defined in the Job Order Proposal Scope of Work." (Art. 6.28.4.3.) The ability to issue a Notice to Proceed without a Job Order does not appear to have been carried over, but LAUSD may direct the contractor to modify the proposal by, for example, adjusting quantities and then resubmitting it. (Art. 6.28.5.) Thus, a contractor is bound by its proposal before a job order issues. The JOCs are binding agreements.

Alternatively, and for the first time on appeal, appellants argue the JOCs are "too indefinite on price and quantity" to allow a court to award expectation damages. Appellants' only example suggests this is a factual question which cannot be raised for the first time on appeal, particularly since this is an appeal from a motion for summary judgment and appellants did not identify this as a fact in their separate statements. Appellants claim: "Pricing for a light bulb installation has to be different if the locale is a domed cathedral, hundreds of feet overhead." Even setting aside the extreme unlikelihood that LAUSD owns a domed cathedral hundreds of feet tall, appellants fail to explain

16

what such pricing is different from. Is it the price to install a light bulb in a classroom? Are appellants claiming that the construction task catalog only has one price for installing a light bulb despite significantly varying conditions throughout LAUSD schools? It is impossible to tell and, in any event, even if appellants had identified a specific task description, we would not be able to resolve the adequacy of the task description without reference to evidence such as the varying conditions in LAUSD buildings, and how such conditions affect light bulb installation, if at all. " 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' " (*United Grand Corp., supra*, 36 Cal.App.5th at p. 153.) We may and do disregard arguments that " 'fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' " (*Ibid*.)

Finally, as the trial court correctly found, even if a completed Job Order were necessary for damages, Job Orders are not separate agreements: they are expressly incorporated into and part of the JOC. A cause of action alleging breach of a JOC is thus sufficient to include a breach of a Job Order issued under the authority of the JOC.

## II. *Western Has Forfeited Its Claims Challenging Denial Of Appellants' Motion For Summary Judgment.*

One of appellants' affirmative defenses was that LAUSD itself breached the contract by failing to independently price the Job Order, one of its obligations under the JOCs. Western appears to contend separately that when the trial court denied appellants' motion for summary judgment it erroneously foreclosed this key affirmative defense, which, it contends, would

17

have relieved them of liability for their own alleged contractual breaches. This argument has been forfeited by Western's failure to supply record citations or a fully developed argument, without which we are unable to understand Western's claim of foreclosure. As we understand the record, the trial court denied summary judgment because it found there was a material issue of fact as to whether the JOCs were contracts to build or contracts to negotiate. This ruling does not foreclose anything: it simply finds a disputed material fact over the nature of the JOCs, leaving that issue and the issue of affirmative defenses to be decided later. " 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' " (*United Grand Corp., supra,* 36 Cal.App.5th at p. 153.) We are not required to develop appellants' arguments for them. (*Ibid.*) "We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' " (*Ibid.*)

III. ***LAUSD's Motions For Summary Adjudication Were Properly Granted In Whole And In Part.***

Shortly after the trial court denied appellants' Motion for Summary Judgment, LAUSD filed two Motions for Summary Adjudication against appellants, one for the Phase I Job Orders and another for the Phase II Job Orders. The motions were made on the ground that Torres breached the JOCs by failing to price its proposals in accordance with the formulas in the General Conditions. The trial court granted LAUSD's motions as to all Phase I Job Orders and some Phase II Job Orders. The partial denial was based on disputed factual issues over the amount of

18

engineering and site inspection services for some Phase II Job Orders.

Appellants contend the trial court's decision to admit and consider additional evidence submitted in LAUSD's reply was erroneous and violated their rights to due process. They contend this alone requires reversal of the court's ruling granting summary adjudication.[7] They also contend the trial court erred in granting the motion because 1) Torres's affirmative defense of offset rendered LAUSD's damages uncertain; 2) independent estimates are a condition precedent under the General Conditions and LAUSD failed to obtain such estimates; and 3) there were triable issues of fact over waiver.

A. *The Trial Court Did Not Abuse Its Discretion In Admitting The Gap Filler Documents Submitted By LAUSD In Reply.*

In support of its Motion for Summary Adjudication on the Phase I Job Orders, LAUSD submitted a computer printout of Torres's Phase I proposals. The printout shows dates which might have reflected the dates the proposals were printed out, rather than the dates they were initially submitted. In opposition, appellants claimed that the proposals could not be the basis of the Job Orders because they were dated after the Job Orders and did not show that the scope of work included engineering and site investigation work. In reply, LAUSD

---

[7] Appellants appear to have submitted a joint Opposition to LAUSD's Motions for Summary Adjudication: the document uses the plural term "defendants" and counsel are listed as counsel for both Torres and Western. The Opposition does not, however, raise any claims specific to Western.

19

submitted a printout from the computer system contractors use to submit bids to LAUSD, showing the dates Torres's proposals were submitted. LAUSD also submitted a revised damages chart which reduced the damages claimed by the amount of the engineering and site investigation work, conceding for purposes of the motion that those charges were proper.

A trial court has discretion to consider new evidence in reply papers supporting a summary judgment motion as long as the opposing party has notice and an opportunity to respond. (*Wall Street Network, LTD. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1183.) Evidence which is used to fill gaps in the original evidence created by the opposition is particularly appropriate to consider in a reply. (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1538.)

Here, appellants claim the evidence was more than a gap filler and they were improperly denied the opportunity to present new evidence. They suggest LAUSD changed its theory by "shift[ing] to subcontractor costs" and that LAUSD's recalculated damages created inconsistencies which raised triable issues of material fact. The record on appeal does not support appellants' contentions. LAUSD's theory of recovery was and remained that subcontractor costs were the appropriate basis for calculations for Phase I and II. LASUD's new damages figures simply reflected the subtraction of the amount of the engineering and site investigation services correctly identified by appellants. This is basic arithmetic, not an unexplained inconsistency.

Appellants claim on appeal that the declaration LAUSD submitted in support of the new evidence contradicted the Blanca Sanchez declaration they submitted. Appellants cite only to the Sanchez declaration and then only to an excluded portion of her

20

declaration.  We do not consider this evidence.  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)  More generally, appellants had ample opportunity to object to LAUSD's new evidence, and did so.  The trial court did not abuse its discretion in considering this gap filler evidence.

> B.   *Torres's Setoff Defense Did Not Create A Triable Issue Of Material Fact Over The Amount Of LAUSD's Damages.*

Torres alleged a setoff affirmative defense, and also claimed a setoff in its cross-complaint.  In Opposition to Summary Adjudication, appellants claimed Torres's setoff defense precluded summary adjudication because the defense created a triable issue of material fact concerning the amount of LAUSD's damages.  More specifically, they contend that by introducing evidence of payments withheld by LAUSD on other jobs, they shifted the burden to LAUSD to disprove these setoffs.  Appellants claim the trial court misunderstood the burden of proof and erroneously found the setoff was not applicable because Torres did not file a cross-motion for summary adjudication.

To support their claim, appellants quote the trial court as saying:  "Where is the motion?  Where is the motion for summary adjudication?  Where is the motion for summary judgment in which you establish your entitlement to these offsets?"  Appellants have taken the trial court's remarks out of context.  The trial court stated the amount of the offset had not yet been adjudicated, and that absent a motion for summary adjudication by Torres, the amount of the offset would be determined at the end of the case.  When Torres claimed the amount of the offset was undisputed, the court replied:  "If it really was undisputed, if they admitted it in their answer to your cross-complaint, then

21

you reduce the judgment." The court even noted that the affirmative defense itself read " '*In the event this answering defendant is found liable* in any manner, . . . this answering defendant would be entitled to offsets and credits against any purported damages, if any, allegedly sustained by plaintiff.' " (Italics added.)

The court's comments as a whole show a correct understanding of the law.[8] A setoff "occurs at the end of litigation." (*Keith G. v. Suzanne H.* (1998) 62 Cal.App.4th 853, 860.) Generally, "a setoff procedure simply eliminates a superfluous exchange of money between the parties." (*Jess v. Herrmann* (1979) 26 Cal.3d 131, 137; see Code Civ. Proc., § 431.70 [where cross-demands for money exist between plaintiff and defendant, defendant "may assert in the answer the defense of payment."] The affirmative defense of setoff is equitable in nature (see *Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 743–744) and so would not ordinarily be decided by the jury which decides the amount of damages. Thus, LAUSD would not have been required to disprove the affirmative defense of setoff at a jury trial, and Torres would not have been entitled to prove it as an affirmative defense at such trial.

––––––––––––––––––––

[8] Appellants focus on the trial court's comments at the hearing. The trial's written ruling and order more clearly state: "Torres is not entitled to these offsets at this juncture because they have not yet been adjudicated, either through trial or some other mechanism such as a motion for summary adjudication or summary judgment. Even if Torres were entitled to an offset, it would be at the end of trial if they can prove the offsets, and such would not defeat the District's MSAs."

22

Moreover, a setoff defense does not negate or change the plaintiff's damages.  (See *Fullington v. Equilon Enterprises, LLC* (2012) 210 Cal.App.4th 667, 685-687 [even where a party's award of compensatory damages is completely offset, the requirement of actual damages as prerequisite for punitive damages is satisfied]; see also *McMillin Companies, LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th 518, 534-535 [equitable offset arising from settlement does not affect amount of damages awarded, only right to *recover* full amount of damages awarded].)

In some instances, a defendant's offset claim may be directly related to and intertwined with the claims asserted in plaintiff's complaint, and deciding one will necessarily decide the other.  This appears to have been the situation, at least in part, in the case appellants rely on, *Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474.  In such cases, summary adjudication on the plaintiff's claim may not be possible unless the defendant's offsetting counterclaim can also be resolved.  Further, as LAUSD points out, *Cal. Lettuce* involved summary judgment which necessarily disposed of the entire action including the offset claim.  Here, Torres's offset defense and counterclaim did not arise from the jobs that were the source of LAUSD's claims, and resolution of LAUSD's claims would in no way decide the merits of Torres's claim for withheld payments on unrelated and undisputed jobs.  Thus, the trial court could decide Torres' offset defense after summary adjudication and before entering a final judgment in the matter.

Relatedly, the trial court excluded the declaration of Marcia Amos, offered by appellants to show the claimed amount of offsets.  The court excluded the declaration on the ground that

23

Amos lacked personal knowledge; Amos offered an improper legal conclusion; and the declaration was barred by the best evidence rule. Appellants contend this was an abuse of discretion.

However, LAUSD had also objected to the declaration on the ground it was not relevant, and in light of our conclusion that an offset defense does not defeat summary adjudication, LAUSD's objection was, and remains, valid. Put differently, even assuming for the sake of argument that the trial court erred in excluding the declaration, any error would be harmless in light of our ruling that an offset defense or claim does not defeat summary adjudication in favor of LAUSD on the issues raised.

C.   *An Independent Estimate Is Not A Statutory Condition Precedent.*

Appellants contend that an independent price estimate by LAUSD is a *statutory* condition precedent before Torres's performance could be required.

Section 20919.11 provides that "[i]n order to prevent fraud, waste, and abuse," a school district using JOCs shall "(a) Prepare for each individual job order developed under a job order contract an independent unified school district estimate. The estimate will be prepared prior to the receipt of the contractor's offer to perform work and will be compared to the contractor's proposed price to determine the reasonableness of that price before issuance of any job order." (§ 20919.11, subd. (a).)

"A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." (Civ. Code, § 1436.) Provisions " 'are not to be construed as conditions precedent unless such construction is required by clear, unambiguous language; and particularly so where a forfeiture would be involved or

24

inequitable consequences would result. [Citations.]' [Citations.] Because 'such conditions are not favored by the law, [they] are to be strictly construed against one seeking to avail [it]self of them. [Citations.]' " (*JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th 571, 594.)

There is no language in the statute expressly conditioning a contractor's duty to prepare a correctly priced proposal on LAUSD obtaining an independent estimate. There is nothing at all in section 20919.11, subdivision (a) requiring a contractor to properly price its proposal. The contractor's statutory duty to price a proposal is found in section 20919.1, subdivision (*l*). This formula is repeated in the General Conditions and supplemented by NPP formula. It is an independent duty.

Further, as LAUSD argues, construing the statutory estimate requirement as a condition precedent would mean transforming a step intended "to prevent fraud, waste and abuse" into a complete bar on seeking recovery for such fraud, waste or abuse. In other words, treating an estimate as a condition precedent would be construing the requirement in favor of Torres, shielding him from liability for any fraud, waste or abuse. The law requires this to be construed against Torres.

Appellants also claim, for the first time on appeal, that the independent estimate requirement is a *contractual* duty and LAUSD has not shown it performed, or was excused from performing, that duty. Appellants contend that we may consider this claim for the first time on appeal because it involves a pure question of law based on undisputed facts. (See *C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th 1483, 1491.) We do not agree.

LAUSD presented evidence that it had performed its contractual obligations by issuing Job Orders and paying Torres for the Job Orders that were the subject of the motions. As appellants acknowledge, in the trial court they did not contest this evidence or argue that LAUSD had failed to fully perform its contractual duties by failing to obtain an independent cost estimate.[9]

Generally, " 'in reviewing summary judgment, the appellate court must consider only those facts before the trial court, disregarding any new allegations on appeal. [Citation.] Thus, *possible theories that were not fully developed or factually presented* to the trial court cannot create a "triable issue" on appeal.' [Citation.] 'A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*Expansion Pointe Properties Limited Partnership v. Procopio, Cory, Hargreaves & Savitch, LLP* (2007) 152 Cal.App.4th 42, 54–55.)

Here, the necessary facts to support appellants' claim were either not before the trial court at all or were not fully developed and factually presented to the court. LAUSD argues on appeal it does not owe such a duty to Torres, and only a breach of a material obligation would excuse Torres's performance or prevent recovery. Whether an obligation is material is a question of fact. (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277.)

---

[9] Appellants did submit evidence which they contend showed LAUSD had not performed independent cost estimates, but the trial court ruled the evidence was irrelevant because an estimate was not a statutory condition precedent.

In addition, LAUSD's position on appeal is that if an estimate were required, the Trimark proposals would be sufficient to constitute an estimate for Phases I and II. Appellants ridicule this idea, but provide no legal authority or record citations to show that the proposals would not qualify. As appellants note in Torres's reply brief, LAUSD's auditor used pricing provided by Trimark for Phase I and II equipment as part of its audit, comparing those prices to the Job Order pricing. "We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.'" (*United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 153.)

D. *There Were No Triable Issues Of Material Fact As To Torres's Waiver Defense.*

Appellants claim they raised triable issues of fact as to the affirmative defense of waiver. "The gist of Defendants' waiver defense is by accepting Torres' job proposals, via the [job orders], the District accepted the contractual terms, even if they were at variance from the [General Conditions]." Appellants did not clearly make this argument in their Opposition to the Motions for Summary Adjudication in the trial court. In fact, the trial court found Torres's affirmative defense of waiver "was raised in the moving papers, and the Court finds it was not addressed by Torres in its opposition."

Through its submission of the Blanca Sanchez and McGallian declarations, appellants attempted to argue that LAUSD had instructed Torres to use a different pricing procedure than the one in the General Conditions, which might be characterized as a waiver argument. However, the trial court

27

excluded those declarations.  On appeal appellants do not challenge that ruling, so we do not consider the content of those declarations.  *(Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1037 [we take the facts from the record that was before the trial court when it ruled on the motion].)

Turning to the issue of waiver as a matter of law, appellants referred to their affirmative defense of waiver only once in their memorandum, in the section discussing the estimate requirement, contending "LAUSD's failure to perform its [cost estimate] duties also creates a genuine dispute of material fact precluding summary adjudication on . . . Torres' affirmative defense of waiver."  Appellants' argument is not clear, but it appears to have been that LAUSD's failure to obtain an estimate meant that Torres did not have to comply with the pricing requirements of the General Conditions, and LAUSD could not waive the estimate requirement and thereby negate its failure to obtain an estimate/restore Torres's pricing duties.  However, the trial court correctly found that the estimate requirement was not a statutory condition precedent to Torres's independent duty to correctly price the work, and so this argument was not relevant.

The closest argument in their Opposition to the argument appellants now make on appeal is their contention that once a Job Order was signed, it took precedence over any conditions in the General Conditions.  They based this contention on provisions that in the event of a conflict or ambiguities between the contract documents, the job orders take priority.  It was only in the Opposition's separate statement that appellants used the term waive, and then only in connection with the argument that the Job Orders trumped the General Conditions.  They stated: "LAUSD entered into a written contract that specifically agreed

28

to waive any prior pricing breaches in the proposal because the Job Order is a contract and [General Conditions] §§3.3 and 3.14 in tandem provide that for a JOC and for a Job Order, the terms of the Job Order prevail over conflicting, different, or discrepant terms in the [General Conditions] and the pricing terms alleged by LAUSD as the basis for breaches are such conflicting, different, or discrepant terms with the terms of the Job Orders and because [General Conditions] 11.2 constitutes written agreement that the Job Order Amount cannot be changed except by Change Order."

This was not really a waiver argument, however. "Waiver requires the intentional relinquishment of a known right upon knowledge of the facts. The burden is on the party claiming a waiver of right to prove it by clear and convincing evidence that does not leave the matter to speculation. As a general rule, doubtful cases will be decided against the existence of a waiver." *(Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1188.)

Appellants rely on a 35-year-old case, which itself relies on a 20-year-old case, for the proposition that " 'A waiver may occur (1) by an intentional relinquishment *or* (2) as "the result of an act which, according to its natural import, is so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." ' " (*Freshman, Mulvaney, Marantz, Comsky, Kahan & Deutsch v. Superior Court* (1985) 173 Cal.App.3d 223, 233–234, italics added.) We question whether inconsistent conduct is a form of waiver, at least where the conduct must induce a "reasonable belief that such right has been relinquished." The *Freshman* court considered the "reasonable belief" of the party asserting waiver, making this

29

standard much closer to estoppel than waiver. (*Id*. at p. 234.)[10] Nonetheless even this broad definition does not help appellants.

The anti-waiver provision of the General Conditions provides: "No action or failure to act by [LAUSD] shall constitute a waiver of a right, remedy, or duty afforded to [LAUSD] under the Contract Documents, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed to in writing." The provision thus prohibits waiver by conduct.

Further, in order for appellants to prevail, LAUSD would have to have waived two rights: 1) the right to have a proposal prepared in accordance with the pricing formulas; and 2) the right to later audit the job order and recover overcharges. Appellants have not pointed to any admissible evidence showing that LAUSD personnel were aware that Torres's proposals violated the General Conditions pricing formulas or that LAUSD expressly relinquished the right to require those formulas. Appellants point to the conduct of LAUSD personnel in approving and signing the job orders. Even assuming for the sake of argument that signing a job order without checking for pricing conformity could be viewed as conduct inconsistent with an intent to enforce the General Conditions pricing formula and that such waiver was not prohibited by the express terms of the anti-waiver

---

[10] "Waiver refers to the act, or the consequences of the act, of one side. . . . Waiver does not require any act or conduct by the other party." (*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd*. (1994) 30 Cal.App.4th 54, 59.) Estoppel is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts. (*Ibid*.)

provision, this conduct would only be inconsistent with an intent to enforce the pricing formulas through the job order issuance process.  The conduct is not inconsistent with a belief that a subsequent audit could and would make a compliance determination and that any overcharges could be recovered.  Thus, for waiver purposes, LAUSD's conduct is not inconsistent with an intent to enforce the pricing formulas.

Appellants also fail to show that waiver would be permissible in a public works contract, specifically a waiver which would operate to modify the JOC process by removing the requirement that a contractor follow the pricing formulas in the General Conditions in preparing its proposal.

"[P]ublic works contracts are the subject of intensive statutory regulation and lack the freedom of modification present in private party contracts."  (*Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228, 242 (*Amelco*).)  Appellants cite *Amelco* for limitations on a court's power to make a new contract, but ignore this important limitation on the parties' ability to modify the contract.  At most, a public entity may waive only inconsequential deviations from contract requirements.  (See *Ghilotti Construction Co. v. City of Richmond* (1996) 45 Cal.App.4th 897, 900 (*Ghilotti*) [requirements for competitive bids].)  Appellants cite *Ghilotti* for the proposition that a public entity can waive contractual rights, but they ignore this important limiting caveat on waiver.

What is inconsequential may vary by the specific procedure or requirement at issue.  Broadly, to be considered inconsequential, "a deviation must neither give the bidder an unfair competitive advantage nor otherwise defeat the goals of

31

insuring economy and preventing corruption in the public contracting process." (*Ghilotti, supra*, 45 Cal.App.4th at p. 900.)

Here, the JOC procedure was authorized both to enable school districts to complete projects more rapidly, to reduce costs, and to reduce complexity. A JOC is defined as "a competitively bid contract . . . in which the contractor agrees to a fixed period, fixed unit price, and indefinite quantity contract." (§ 20919.1, subd. (e).) Indefinite quantity means "one or more of the construction tasks listed in the catalog of construction tasks." (*Id.,* subd. (c).) A JOC contractor has a statutory duty to price its job order proposals using a formula based on the construction task catalog where applicable. (*Id.*, subd. (*l*).)

A job order which waives the use of the statutorily prescribed pricing formula which defines job order contracting is not an "inconsequential" deviation from contract requirements as a matter of law.[11] These pricing formulas are the heart of the JOC process. It defeats the statute's goal of ensuring both speed and low costs by prepricing tasks (or if no such task is found in the catalog of tasks, using a specified formula for NPP work).[12] More concretely, in this case the deviations did result in significantly higher costs.

_____

[11] Here, we are faced with a waiver claim that applies to the entire JOC order. We do not consider whether a waiver of the price formula for a small portion of a job order would be consequential or inconsequential.

[12] The Legislature intended that a more traditional method of job delivery be used only when it results in greater cost savings. (§ 20919, subd. (f).) Appellants' waiver argument is contrary to that intent.

There is no evidence of corruption here, but it must be recognized that deeming a complete waiver of the pricing formulas inconsequential defeats the goal of preventing corruption in the public contracting law. Corruption spans a wide range of conduct, including collusion and favoritism, as well as fraud. (*Amelco, supra*, 27 Cal.4th at p. 240.) A contractor is awarded a JOC on the basis on its low adjustment factor bid; the statute specifies the factor be applied to construction task unit prices. If LAUSD could waive the unit pricing provisions, a contractor could bid an unreasonably low adjustment factor, in the hope or knowledge that LAUSD would waive the requirement that the contractor follow the pricing formulas which use the adjustment factor. That would also give the contractor a unfair competitive advantage.

IV. ***To Prevail On Its Motions LAUSD Was Not Required To Disprove Western's Boilerplate Affirmative Defenses.***

Western separately contends the trial court erred in granting LAUSD's motion for summary adjudication because LAUSD did not disprove Western's affirmative defenses of lack of contractually required notice, bar by the statute of limitations and damages not recoverable under bond.

This argument was not raised in appellants' Opposition to LAUSD's motion. There are no references to these affirmative defenses at all. The trial court specifically noted that Torres's "oppositions made no challenge to Western's liability under the bond."

Western now attempts to claim that LAUSD was required to disprove these defenses as part of showing performance under the bonds. Western has characterized these issues, accurately, as

33

affirmative defenses, not as elements of LAUSD's performance obligations.  (See *Standard Oil Co. v. Houser* (1950) 101 Cal.App.2d 480, 488 [statute of limitations, conditions precedent, exoneration and similar claims are affirmative defenses which must be pled in the answer].)  A plaintiff moving for summary judgment is not required to disprove affirmative defenses not sufficiently put at issue by the defendant's answer.  (See *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 384-385 [defendant's laundry list of 16 affirmative defenses which essentially stated the name of the defense and that it barred recovery did not raise any issues of material fact that plaintiffs were required to disprove].)  Western alleged 35 such affirmative defenses in such boilerplate fashion, and provided no facts during discovery to support any defense.  LAUSD had no burden to disprove the listed defenses.

V.    ***The Trial Court Properly Awarded LAUSD Prejudgment Interest.***

Appellants contend the trial court erred in awarding prejudgment interest from the date of the last retention payment on each Job Order because the amount of the damages was uncertain.  Appellants also contend the trial court erred by awarding such interest before adjudicating its offset affirmative defense.  Appellants contend that at most the trial court had discretion to award prejudgment interest from the filing of the complaint, and that it abused its discretion in this case by making that award.

Prejudgment interest may be awarded where damages are certain or capable of being made certain by calculation.  (Civ. Code, § 3287, subd. (a).)  Prejudgment interest may also be awarded for unliquidated damages in breach of contract causes of

34

action, but such interest may begin no earlier than the action was filed. (*Id.*, subd. (b).) "Generally, the certainty required of Civil Code section 3287, subdivision (a), is absent when the amounts due turn on disputed facts, but not when the dispute is confined to the rules governing liability." (*Olson v. Cory* (1983) 35 Cal.3d 390, 402.)

On appeal appellants now contend the damages were uncertain because ascertainment of the amount of damages required expert trial testimony. Appellants do not provide record citations showing they argued for some alternative calculation of damages. Indeed, in the trial court, appellants generally claimed LAUSD had agreed to the amounts in the Job Orders and so had not suffered damages. A claim that damages is $0 is not a dispute which renders the amount of damages uncertain; it is effectively an argument for no liability.[13] A defendant's denial of liability does not make damages uncertain for purposes of Civil Code section 3287. (*Stein v. Southern Cal. Edison Co.* (1992) 7 Cal.App.4th 565, 572.)

Appellants then argue that their offsets made LAUSD's damages uncertain. Not so. "[O]nly the claimant's damages themselves must be certain. Damages are not made uncertain by the existence of unliquidated counterclaims or offsets interposed by the defendant." (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 536.)

---

[13] In Torres's reply brief, appellants contend that damages "required a judicial determination based on conflicting evidence that ultimately re-wrote the firm, fixed-price JO amounts." This reinforces our conclusion that appellants' only "conflicting" evidence about the amount of damages was that damages should be $0.

VI.    ***The Trial Court Properly Denied Western's Motions For Directed Verdict.***

Western unsuccessfully moved for directed verdicts based on three of its affirmative defenses. These motions applied only to the Job Orders which had survived summary adjudication and made it to trial. The trial court denied all three motions, and stated that in the alternative it would strike the motions for abuse of discovery. Western contends the trial court erred in denying the three motions, and in striking the defenses as a discovery sanction. Because we affirm the trial court's substantive rulings on the motions, we need not and do not reach the discovery sanction issue.

"Like a motion for nonsuit, a motion for a directed verdict is in the nature of a demurrer to the evidence. [Citations.] In determining such a motion, the trial court has no power to weigh the evidence, and may not consider the credibility of witnesses. It may not grant a directed verdict where there is *any* substantial conflict in the evidence. [Citation.] A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629–630 (*Howard*).)

A directed verdict is subject to de novo appellate review. (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210.)

36

A.     *Western Failed To Identify Evidence Of A Key Date Needed To Prevail On Its Statute Of Limitations Motion.*

Western contends "[e]ach of the bonds contained express contractual limitations periods providing . . . 'Any action on this Bond shall be commenced within three (3) years of the date of Substantial Completion.' (27AA10034:20-10035:3.)"  This record citation, the only one purporting to be to the bonds, is to the argument sections of Western's motion, not the bonds themselves.  It is Western's responsibility to provide a record citation to the bonds at issue which contains the language upon which it relies; Western's previous quotations in a motion are not sufficient.  (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 (*Nwosu*) [party's argument deemed forfeited if not supported by necessary citations to the record].)  This is particularly true as LAUSD contends only two of the five bonds that were the subject of Western's motion had such limitations periods.

A motion for directed verdict is in effect a demurrer to the evidence, and cannot be granted where there are any substantial conflicts in the evidence.  (*Howard*, *supra*, 72 Cal.App.4th at p. 629.)  Here, there are no facts, undisputed or otherwise, in Western's Opening Brief, reciting the dates that the statutes of limitations began to run for each job order.  Western contends the statute begins to run on the date of Substantial Completion, but does not provide any citations to the record on appeal where evidence of the date of Substantial Completion can be found.  Western refers to testimony in a reporter's transcript which is not part of the record on appeal.[14]  Western then states LAUSD "had

---

[14]     As described by Western, LAUSD's expert James Becica testified that LAUSD had three opportunities to discover

37

no obligation to issue a Certificate of Substantial Completion or file a Notice of Completion until 'all of the requirements of the Job Order are completed.' (27AA10041:1-3.)" This is a citation to the last page of its motion.

Western has forfeited this claim by failing to provide record citations to the documents which it claims show the dates of Substantial Completion. (*Nwosu*, *supra*, 122 Cal.App.4th at p. 1246.) Further, as LAUSD points out, the Certificates of Substantial Completion upon which Western relied in its motion were not trial exhibits, were not admitted into evidence, and are not part of the appendix or other appellate record.

In its reply brief, Western narrows its argument to a single bond and to Notices of Completion for nine job orders which it asserts were admitted at trial. We decline to consider these documents, provided for the first time in the reply brief, particularly in light of Western's overstatement in its Opening Brief. Western's carelessness has deprived LAUSD of the opportunity to address these specific documents and Western's related arguments. (See *American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275-276 ["Fairness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives the respondent of the

_____

problems with Torres's proposals, the last of which was the audit. Western suggests the audit occurred within the limitations period, but does not further develop this argument. "We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' " (*United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 153.)

opportunity to counter the appellant by raising opposing arguments about the new issue."].)

We briefly note that a Notice of Completion alone would not appear to be sufficient to show the date of substantial completion. The purpose of such notices is "to protect property owners by shortening the time period in which lien notices may be filed against them." (*Kray Cabling Co. v. County of Contra Costa* (1995) 39 Cal.App.4th 1588, 1594.) Given the number of published appellate opinions discussing issues related to premature filing of notices of completion (see, e.g., *Fontana Paving, Inc. v. Hedley Brothers, Inc.* (1995) 38 Cal.App.4th 146, 154–155; *Scott, Blake & Wynne v. Summit Ridge Estates, Inc.* (1967) 251 Cal.App.2d 347, 357 (*Scott*); *Otis Elevator Co. v. Brainerd* (1909) 10 Cal.App. 229, 232), filing a premature notice of completion appears common.[15] Thus, a notice of completion is not necessarily proof the work has in reality been substantially completed.

B.     *LAUSD Was Not Required To Provide Notice Of Torres's Improper Pricing.*

Western contends LAUSD never gave the required notice making a demand upon the bonds until it filed this lawsuit, and that this lack of notice constitutes a material breach of the bonds and renders them null and void. Western contends "[e]ach bond

---

[15]     In *Scott*, for example, the owner filed a premature notice of completion and the court explained that, notice notwithstanding, the work was not in fact complete until the plaintiff, whose services were basic to the scheme of improvement, had completed its services under the contract. (*Scott, supra,* 251 Cal.App.2d at pp. 357–358.)

at issue contained its own express notice requirements prior to triggering the liability of Western's."

Western fails to provide record citations for these bonds. Further, Western does not quote any notice language from the bonds and does not explain how such language applied to the facts of this case. Accordingly, Western has forfeited any claim based on the language of the bonds. (*Nwosu*, *supra*, 122 Cal.App.4th at p. 1246; *United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 153.)

Western does rely on language from the General Conditions to support its claim. It appears to be undisputed that LAUSD did not give notice before the commencement of this action; LAUSD's position was that notice was not required. Thus, we will consider this portion of Western's argument.

Western relies on Articles 15.5.10, 15.5.11 and 15.5.12. Article 15.5.10 provides that if, in the opinion of LAUSD, certain failures occur, "then [LAUSD] shall give notice as required by Article 15.5.11 or Article 15.5.12, as applicable." Article 15.5.11 concerns safety violations and is not applicable here.

Article 15.5.12 provides: "[B]efore [LAUSD] can proceed under Articles 15.5.15 and/or 15.5.16, [LAUSD] shall first send a written notice to CONTRACTOR and its performance bond surety . . . ."

The preamble to Articles 15.5.13 through 15.5.16 states: "[LAUSD] may, at its sole option and without prejudice to any other rights and/or remedies [LAUSD] may have at law, under the Contract, the performance bond(s), and/or in equity, do any and/or all of the following . . . ." Articles 15.5.13 and 15.5.14 involve revoking the contractor's prequalification status and/or declaring him a non-responsive bidder, while Article 15.5.16

40

involves termination of the contractor's services; none of these provisions are applicable here.

Article 15.5.15 provides LAUSD may "make good such deficiencies (i.e., Articles 15.5.1 through 15.5.10, inclusive) by whatever method [LAUSD] deems most expedient with all costs and expenses thereof being deducted, and/or drawn down, and/or charged against, the Contractor, the Contract funds, including retention, and/or the performance bond . . . ."

Western offers no argument concerning the scope or meaning of Article 15.5.15. LAUSD contends it refers to "construction administration tasks during the progress of the work, such as remedying defective work or failing to pay subcontractors."

Article 15.5.10 is broad, and refers to the contractor's failure "to adhere to any provision of this Contract." Thus, in the abstract, Article 15.5.10 could include Torres's failure to follow pricing procedures. Western does not explain what LAUSD did to make good any such deficiency, however. The only action LAUSD has taken is this lawsuit, and the language of the preamble to Articles 15.5.13 through 15.5.16 indicates lawsuits are not included in those options. Further, the activity described in Article 15.5.15 -- making good a deficiency and then charging the contractor, construction or retention funds and/or the performance bonds for the work -- is not the equivalent of a lawsuit. Thus, LAUSD was not required to give notice by the terms of the General Conditions.

Contrary to Western's suggestion, there is no requirement under California law requiring notice to the surety. After citing federal and out-of-state cases, Western contends "California courts apply this reasoning. Since the bond usually requires the

41

owner to notify the surety of the contractor's default under the construction contract, notice of the principal's default is a material term of the bond and a condition precedent to the surety's liability."  We have no doubt California courts apply the identified reasoning in cases in which there is an applicable contractual notice requirement.  California law, however, expressly provides:  "A surety who has assumed liability for payment or performance is liable to the creditor immediately upon the default of the principal, and without demand or notice."  (Civ. Code, § 2807.)  Thus, "[a]bsent a contract provision, the surety is not entitled to notice of the principal's default." (9 Miller & Starr, Cal. Real Estate (4th ed.2020) § 32.100.) Western has not shown there is an applicable notice provision which LASUD failed to follow and so its claim fails.

C.   *Western Failed To Show That LAUSD's Damages Were Not Recoverable Under Westerns's Bonds.*

Western contends that LAUSD seeks "overpayment" damages and such damages are not recoverable under the bonds. Western does not cite any specific provisions of the bonds which bar such recovery.  It spends almost five pages of argument on general legal principles concerning changes in the relationship between the contracting parties, the role of contract funds as security and the effect of premature payments concerning premature payment of contract funds.  It barely explains the application of these broad principles to the facts of this case.

Western's first legal discussion states:  "Under settled principals of suretyship, a surety is discharged or exonerated from its bond obligations when there is a material alteration of

42

the principal obligation. ([Civ. Code, § 2819;[16] *R. P.*] *Richards, Inc. v. Chartered Construction Corp.* (2000) 83 Cal.App.4th 146, 154 [(*R. P. Richards*)]). . . . 'A material alteration is one that works some change in the rights, interests, or obligations of the parties to the writing.' (*Hill & Morton, Inc. v. Coughlin* (1963) 214 Cal.App.2d 545, 549 [(*Hill & Morton*)].) [¶] In addition to any material alteration, 'Civil Code § 2819 exonerates a surety if the creditor . . . impairs or suspends the creditor's "remedies or rights" against the debtor.' (*Bennett v. Leatherby* (1992) 3 Cal.App.4th 449, 452 [(*Bennett*)].)"

Western does not explain how these general rules apply to the facts of the case. In *R. P. Richards*, the promisee (a subcontractor) and the principal (the general contractor) entered into a settlement and release of the subcontractor's claim against the general without the surety's knowledge or consent; thereafter the subcontractor continued to prosecute its claim against the surety. (*R. P. Richards*, *supra*, 83 Cal.App.4th at p. 150.) *Bennett* involves a similar settlement of claims and a release. (*Bennett, supra*, 3 Cal.App.4th at p. 451.) *Hill & Morton* involves a change in method of payment by a retailer so that its wholesaler lost its right to seek payment directly from the retailer's customers. (*Hill & Morton*, *supra*, 214 Cal.App.2d at p. 549.) This case, of course, does not involve a settlement and release or a loss of assigned payments. Western turns

---

[16] Civil Code section 2819 provides: "A surety is exonerated, except so far as he or she may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended."

43

immediately to a discussion of collateral and "overpayment" so perhaps it sees a connection there. We do not.

Western discusses the issue of collateral only in general terms, stating the general proposition that "[c]ontract funds in the possession of an obligee are collateral security to protect the surety against loss in the event its principal defaults." This is an inaccurate summary of the dicta in *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28 (*Cates*). The phrase "collateral security" does not appear in *Cates*. Perhaps Western is referring to the court's statement that "it is common for construction contracts to contain terms that protect an owner's construction funds." (*Id*. at p. 55.) If so, Western has not identified any of the specific terms which it claims protected the construction funds in this case, or explained how those terms were intended to protect it.

Western also argues that "overpayment" exonerates a surety. All California cases cited by Western to support this argument in fact refer to "premature" payments.[17] As Western recognizes, premature payments occur when money which is intended to be kept by one party until a specific milestone is reached, is instead released before that milestone, which is often completion of some phase of work. (*County of Glenn v. Jones* (1905) 146 Cal. 518 [contractor asked owner to alter terms of contract and pay contractor before all materials were delivered;

---

[17] In its reply brief, Western provides a quote from *Cates*, which uses the term "overcharging" but does not explain why it failed to cite *Cates* on the topic of overcharging in its opening brief. In any event, the statement in *Cates* is dicta, and in context refers to premature payments. (*Cates*, *supra*, 21 Cal.4th at pp. 55–56.)

44

contractor did so]; *Siegel v. Hechler* (1919) 181 Cal. 187, 190 [the contractor "had the right to pay these bills at the time they were paid" and so the payments were not premature]; *Burr v. Gardella* (1921) 53 Cal.App. 377, 387–388 [payments were made "according to the requirements of the contract as to when certain payments should be made" and so were not premature]; see *American Insurance Co. v. Heritage Construction Corp.* (N.D.Cal. 1966) 268 F.Supp. 336, 343 [premature payment claim involved alleged premature disbursal of funds from a specified security fund "which the surety stipulated should be kept on hand pending the lien filing period"].)

Western does not point to any specific payment milestones here which were tied to correct pricing of the Job Order, and for this reason alone its analogy is inapt. We see no similarity between an owner's payment of an inflated price contained in the contract documents, apparently made on the schedule set forth in those documents, and the payment of a proper sum in disregard of the payment schedule in the contract documents.

Rather than develop this analogy, Western reverts to its use of the term "overpayment" and argues that if LAUSD had followed its own guidelines for job order approval and for owner's review and approval of payment applications submitted on the project, LAUSD would not have made any overpayments. Western argues it did not bond LAUSD's errors, omissions, neglect or mistakes.

Western did bond Torres's performance of all the terms and conditions of its contract with LAUSD, and those terms and

conditions include properly pricing its proposals.[18]  Western does not point to any evidence, let alone undisputed evidence, that LAUSD failed to follow its guidelines for job order approval or that if LAUSD had followed the guidelines, Torres's breach of contract in pricing the items would have been discovered.  Western's references to the owner's review of payment applications are made entirely without context.  Western's only record citation is to its directed verdict on this topic, but those pages contain only general legal arguments.  Western has forfeited this claim.

Finally, the entire concept of overpayment (or premature payment) as a bar to recovery of overcharges or overpricing is inconsistent with the audit provisions of the General Conditions.  Article 6.55 requires a contractor to "maintain  . . . records and allow . . .  audits for a period of up to four (4) years following the date the Notice of Completion is recorded."  If an audit uncovers overcharging or overpricing in excess of 1 percent of the total contract amount, that "overpricing or overcharges . . .  by the

---

[18]    Western's bonds provide: "The condition of this obligation is that if the CONTRACTOR shall in a workmanlike manner promptly, competently, and faithfully perform the Work and all of the terms, conditions and provisions of the Contract, in strict conformity therewith, then this Bond shall be null and void; otherwise, this Bond shall remain in full force and effect."

Where the bond is "explicit" "in tying [the surety's] obligations under the bond to [the contractor's] performance or nonperformance of all the covenants, conditions and agreements of the underlying contract" then the bond does guarantee performance of all covenants, conditions and agreements. (*Fort Bragg Unified School Dist. v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 911-912.)

46

CONTRACTOR . . . shall be reimbursed to [LAUSD] by the Contractor." This audit provision, like all terms and conditions of the contract, was incorporated into the bonds.

By specifying that LAUSD could recover for overcharging or overpricing up to four years after the Notice of Completion, the provision clearly contemplates an audit may occur well after the physical work on the project is complete. This provision would be meaningless if, as Western's argument would require, LAUSD could only recover for overcharges or overpricing if it had somehow presciently not paid those amounts before undertaking an audit. The audit provision contains no requirement for LAUSD to withhold funds or final payment until it completes an audit of a project for overcharging or overpricing.

VII. ***The Trial Court Did Not Abuse Its Discretion In Awarding Attorney Fees To LAUSD.***

LAUSD sought a total of $2,123,277.20 in attorney fees for its six years of work on this case. The fee motion was supported by the declaration of lead attorney David Huff and very heavily redacted billing statements. Western claims that the Huff declaration does not have enough detail to permit an evaluation of or opposition to the fee request and the bills are so heavily redacted as to be meaningless. Western contends the trial court abused its discretion by "rubber stamping" the fee request and violated Western's right to due process.

We review the trial court's determination of a reasonable attorney fee for abuse of discretion. (*Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 697 (*Syers Properties III*).)

" '[T]he " 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed

47

unless the appellate court is convinced that it is clearly wrong.' " ' " (*Syers Properties III*, *supra*, 226 Cal.App.4th at p. 698.) Generally "the trial judge [who] presided over the entire matter . . . [is] well able to evaluate whether the time expended by counsel in this case, given its complexity and other factors, was reasonable." (*Id.* at p. 700.)

LAUSD submitted only one declaration in support of its fee motion, the declaration of David Huff, its lead attorney. Mr. Huff described his own work as follows: "I was the primary trial attorney; developed strategy in this litigation and for trial; prepared witnesses and exhibits for trial; and prepared for and attended the mediation and hearings for most motions in this case." Mr. Huff billed 734.5 hours.

The Huff declaration also described the work of other attorneys:

"Mr. Barr responded to the voluminous discovery propounded by Defendants; opposed motions to compel; propounded discovery on Defendants; and took or defended over thirty depositions in this case. Mr. Barr also prepared witnesses for trial, attended the trial, and opposed the motions for directed verdict brought by Defendants." Barr billed 2266.4 hours.

"Ms. Houle-Sandoval worked to develop the discovery and trial·strategy; assisted in the production of tens of thousands of documents for the District; responded to the voluminous discovery  propounded by Defendants and drafted discovery propounded by the District; assisted in preparing for  numerous depositions; reviewed the thousands of documents produced by Defendants; identified and prepared the witnesses and exhibits for trial; drafted and opposed the 18 total motions in limine; prepared the joint long cause binders submitted to the Court on

48

behalf of all parties; prepared the three  motions for summary adjudication brought by the District and opposed the two motions for summary adjudication/summary judgment; opposed the motions to compel brought by Defendants; attended the trial; drafted motions to exclude witnesses during trial; drafted the District's motion for directed verdict; and prepared for the bench trial on Defendants' offset claims."  Ms. Houle-Sandoval billed 3731.8 hours.

"Niv Davidovich assisted in drafting the District's motions for summary adjudication on its claims, as well as opposing Defendants' motions for summary adjudication/motion for summary judgment, and assisted in developing general litigation strategy."  He billed 634.4 hours.

The Huff declaration also described the work of the head paralegal, Kelly Lucas:  "Ms. Lucas was instrumental in organizing and maintaining the large litigation files; scheduling and attending site inspections at the cafeterias; reviewing and organizing  documents during the discovery process; assisting with the production of expert documents; reviewing  and organizing documents and voluminous exhibits for the trial; preparing the exhibit list for trial; preparing and assembling key information for use during depositions and witness examinations at trial; and assisting in the preparation of this Motion." Ms. Lucas billed 2223.3 hours.

At the hearing on the fee motion, Western indicated it did not have a problem with the fees for Huff, Barr and Sandoval, whom Western described as the three principal attorneys for LAUSD.  LAUSD lead attorney Huff then pointed out that attorney Niv Davidovich was very involved in the summary adjudications motions and "appeared at the hearing as reflected

in the court's minute order." The court then noted that those four attorneys plus lead paralegal Kelly Lucas accounted for about $1.95 million of the $2,123,277.20 sought by LAUSD.[19] The court's calculation of the total fees for those five persons indicates it accepted all their work as necessary.[20] That left $174,430.08 in miscellaneous fees. The trial court awarded a total of $2.1 million in attorney fees. That $23,277.20 decrease represents a 13 percent reduction of the $174,430.08 in miscellaneous fees.

The trial court was not asked for and so did not provide a statement of decision. Western contends that where a trial court does not explain how and why it reached its fee award, a heightened sense of arbitrariness is inescapable.

The court revealed some of its reasoning and concerns during the hearing. The court explained: "I have a moderately intimate familiarity with the history of this case because it's been before me its entire duration. And I have been through multiple summary judgment or summary adjudication motions as to various portions of this and also presided at trial."

Turning to the merits of the motion. the court stated: "There seem to be two principal objections raised. One is the number of people who at one time or another have worked on different pieces of this." The court explained that "[h]aving in my own practice been involved in . . . similarly-intense, dollar-heavy,

---

[19]   The fees for David Huff ($181,954.02), Colin Barr ($557,221.20), Kelly Houle-Sandoval ($846,743.30), Niv Davidovich ($140,233.50) and Kelly Lucas ($222,695.10) total $1,948,847.12.

[20]   Defense counsel did not discuss the hours for paralegal Lucas.

highly-contested litigation, and including substantial and prolonged jury trials, I do have a familiarity with what it takes." The court concluded: "I understand why people would be pulled in here and there to help with little pieces of it. But I do see there is only . . . three attorneys, who are doing the bulk of this. So the number of people involved really doesn't bother me."

The court then identified "the other question which really is the substantive issue is we have all these billing statements. Great, I love billing statements. I like to see what is there, but some of these are so heavily redacted that . . . it's very, very, very difficult to tell how much time was spent and for what." The court stated: "This makes it difficult for me to analyze. Given the stakes in this case, given the intensity with which it was litigated, given the duration of the case, given the volume of discovery that was involved in this case. I am hardly shocked by the dollar total." The court added: "In the best of all possible worlds, I would be a lot happier to see a set of bills that only redacted the subject of attorney-client communications." The court then asked if there was another way to approach the fees.

Mr. Huff replied: "What I would say is that, you know, the heartland of the court's inquiry today is does [the] value of the services rendered does that equate to the fee requested." The court nevertheless expressed concern that the redacted bills might conceal inadvertent duplicate billing. Turning to one set of task entries for one of the principal attorneys, the court stated: "Now I appreciate that the time for different tasks has been broken out. But we have several of these that are for the same amount of time, and I have in the past reviewing attorneys' fees bills found things that are essentially duplicate entries that were

not caught.  And one of the things that this makes it very difficult to do is say are any of these duplicate entries."

Western agreed that potential duplication was a concern, and also expressed concern that it was not possible to tell if the work was "reasonably necessary [and] was efficient."  The court expressed some reservations about these additional concerns, replying "I don't know."

These remarks show the court was familiar with the amount of work and cost of a case like this, found the total amount of LAUSD's attorney fees reasonable, and had some concerns about duplicate time entries.  Western effectively conceded the $1.95 million billed by four attorneys and the head paralegal.  Its concern was with the other attorneys who billed smaller amounts of time but whose fees still totaled about $174,000.  While the trial court did not share all of Western's concerns, the court was concerned about duplicative billing based on its own reading of the bills.  The court reduced the remaining fees by about 13 percent, which is a substantial amount.  It is reasonable to infer that this reduction reflected the trial court's concern about potentially duplicative entries.  We see no abuse of discretion in the trial court's decision.

We see no merit in Western's claim that it was denied due process because it was unable to effectively challenge the attorney fees amount due to the redacted billing.  Western and Torres shared counsel, and so that counsel was familiar with all the defense work involved in the case and could have used those numbers as a base to evaluate the overall hours billed by LAUSD, and, in many cases, the appropriate hours for particular tasks.  Western had, or should have had, copies of all the pleadings in the case, a record of the volume of discovery, and the

deposition and trial transcripts.  Western could have hired an expert to use that information to estimate the appropriate hours for the work involved.  Presumably that is what an expert would have done even if the bills were complete.  Significantly, this is not a case with a great variation in the attorney's hourly rates, and an expert could have simply categorized the work into one of two hourly rates ($259 or $240)[21]

## DISPOSITION

The judgment is affirmed.  LAUSD is awarded costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

GRIMES, Acting P. J.

WILEY, J.

---

[21]     A few attorneys billed a small number of hours at $205 per hour.